IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CARL BALDWIN, | ) | Case No. 3:20-cv-206 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Carl Baldwin, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Baldwin's DIB application be affirmed.

## II.      Procedural History

Baldwin filed for DIB on November 21, 2016.  (Tr. 198).[1]  He alleged that he became disabled on October 28, 2016 due to diabetes, depression, degenerative arthritis, permanent damage to right shoulder, permanent damage to right knee, right hip, lower lumbar, right wrist.  (Tr. 198, 231).  The Social Security Administration denied Baldwin's application initially and on reconsideration.  (Tr. 122, 139).  Baldwin requested an administrative hearing.  (Tr. 132).  ALJ

---

[1] The administrative transcript is in ECF Doc. 10.

Mary Morrow heard Baldwin's case and denied the claim in a December 3, 2018 decision.  (Tr. 15-32).  On November 29, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On January 30, 2020, Baldwin filed a complaint challenging the Commissioner's decision.  ECF Doc. 1.

III.    **Evidence**

A.      **Relevant Medical Evidence**

On September 21, 2015, Baldwin fell from a ladder at work and injured his back and his right shoulder, hip and knee.  (Tr. 347-354, 529).  On February 12, 2016, he underwent surgery to address a medial meniscal tear to his right knee.  (Tr. 526-527).  On March 17, 2016, Baldwin underwent surgery to address the injury to his right shoulder.  (Tr. 524-525).  Both of Baldwin's surgeries were performed by Dr. James Lyons.  These surgeries took place prior to Baldwin's reported disability onset date of October 28, 2016.  (Tr. 198).

On October 26, 2016, Baldwin consulted with Dr. Ryan Szepiela for lower back pain. Baldwin rated his pain as a 5/10 and complained that pain worsened with any movement.  Because Baldwin did not feel that physical therapy had improved his condition, Dr. Szepiela ordered an MRI.  (Tr. 482-484).

On November 14, 2016, Teresa J. Kahler, Ph.D., evaluated Baldwin for a psychological condition related to his workers' compensation claim.  (Tr. 447-450).  Baldwin complained of problems sleeping, poor concentration and memory difficulties since his work accident.  (Tr. 448). He also reported that he felt helpless and hopeless about his ability to work.  Baldwin was cooperative and fully oriented, but Dr. Kahler observed an extremely flat/depressed affect. Testing showed that Baldwin was moderately somatically focused, severely clinically depressed, highly repressive of his thoughts and feelings, angry and rebellious and experiencing extreme psychological turmoil.  (Tr. 449).  Dr. Kahler diagnosed major depressive disorder related to

Baldwin's work injury and opined that he was "temporarily and totally disabled" from all work. (Tr. 449-450).

In November 2016, Baldwin underwent a vocational assessment at Goodwill Industries. (Tr. 1496-1500).  John H. Leering, III, M.S., Ed., CRC, CVE, performed the evaluation.  Mr. Leering opined that, given Baldwin's lack of transferable skills, complete lack of computer skills, inability to sit longer than 45 minutes and inability to drive for one hour without his right arm becoming numb, Baldwin was not capable of sustaining substantial gainful employment at that time.  (Tr. 1500).

Physical therapist, Gregg Hutton, evaluated Baldwin on December 16, 2016.  (Tr. 592-593).  Mr. Hutton reported that Baldwin was able to work at the sedentary/light physical demand level for an 8-hour day with "acceptable leg lift capability of 8.0 lbs. and torso lift capability of 8.0 lbs.  (Tr. 592).

Baldwin saw Dr. Scott Frederick on January 9, 2017 for low back pain.  (Tr. 560-562).  Baldwin described the pain as stabbing in his right lower back with radiation to his left side.  (Tr. 562).  Examination showed limited range of motion in the right shoulder, but normal gait, good range of motion in the right leg and negative straight leg raising.  Dr. Frederick ordered a lumbar x-ray and prescribed Naproxen for pain.  (Tr. 563).  The x-ray showed only mild degenerative changes in the lumbar spine.  (Tr. 1586).  Dr. Frederick also ordered physical therapy, which Baldwin underwent from January 13, 2017 through January 27, 2017.  He was discharged from physical therapy due to noncompliance.  (Tr. 1561).

Baldwin returned to see Dr. Frederick on January 27, 2017.  (Tr. 556).  He reported that physical therapy had not helped, but that Naproxen relieved pain at times.  Dr. Frederick ordered a lumbar MRI.  (Tr. 560).   The MRI showed early degenerative disease of L4-5 with disc

desiccation, a right posterior lateral annular tear and mild carpal and moderate foraminal disease. (Tr. 470).

Baldwin saw Dr. Szepiela on March 13, 2017 to review his lumbar MRI.  (Tr. 478-479). Dr. Szepiela could not do an injection to relieve pain because Baldwin's blood sugar level was too high.  Baldwin asked about a referral to a hip surgeon.  (Tr. 479).

On April 24, 2017, Baldwin met with Dr. Anil Gupta for right hip pain.  Dr. Gupta examined x-rays of Baldwin's right hip and noted that conservative treatment had been unsuccessful.  He ordered an MRI of Baldwin's right hip.  (Tr. 586-587).  The MRI showed an anterior superior labral tear and degenerative changes.  (Tr. 1539).  On June 5, 2017, Dr. Gupta recommended a hip injection and careful monitoring of Baldwin's blood sugar levels.  He also referred Baldwin for an evaluation of his low back because he thought Baldwin was "more symptomatic from his lumbar spine than from his hip."  (Tr. 1538).

On July 20, 2017, Baldwin saw Dr. Ashok Biyani for low back pain.  Baldwin reported pain with low back movement.  Dr. Biyani observed a normal gait and 5/5 strength in the legs.  Dr. Biyani reviewed Baldwin's lumbar MRI and opined that the disc bulge at the L4-L5 level was "pretty small" and was causing "very mild" foraminal narrowing.  He recommended physical therapy and chiropractic care.  (Tr. 1535).  Baldwin started chiropractic care later than month.  (Tr. 1633-1678).

On September 28, 2017, Baldwin went to the Henry County Hospital for pain management for his back.  (Tr. 1618-1620).  Baldwin complained that back pain had been affecting his sleep and that he had tried pain medications without much benefit.  (Tr. 1618).  The attending physician recommended back injections, with some alterations to account for Baldwin's uncontrolled blood sugar levels.  (Tr. 1620).

4

On October 24, 2017, an EMG of Baldwin's legs showed radiculopathy from his back and polyneuropathy, likely from his diabetes.  (Tr. 1730).

Baldwin returned to Henry County Hospital for pain management on November 13, 2017. He reported that injections had significantly relieved his pain, but only temporarily.  The attending nurse practitioner recommended that Baldwin undergo a rhizotomy, to relieve his chronic back pain.  (Tr. 1612-1613).  Baldwin underwent a rhizotomy on November 30, 2017.  (Tr. 1608).

On November 28, 2017, Baldwin met with Dr. Thomas Sherman for medication management for his mental impairments.  (Tr. 1547-1553).  Baldwin continued to see Dr. Sherman every few months for management of his psychiatric medications.  (Tr. 1544-1546).

On December 21, 2017, Baldwin reported some pain relief from the rhizotomy, but stated that he continued to have right-sided low back pain.  (Tr. 1602).  The attending physician recommended a one-time transforaminal lumbar injection.  (Tr. 1602).  Baldwin received the injection on January 18, 2018.  (Tr. 1597).

Baldwin saw Dr. Kahler for counseling on February 6, 2018.  She observed that he was down, bored and frustrated and that his affect was "very flat."  (Tr. 1698).  Baldwin treated with Dr. Kahler through July 23, 2018.  During his counseling, Baldwin frequently reported poor sleep. Helping others seemed to help with his mood.  (Tr. 1697-1698).

On February 1, 2018, Baldwin reported that the transforaminal epidural steroid injection had given him one week of relief before his pain returned to baseline.  (Tr. 1595).  Baldwin saw Dr. Biyani on February 13, 2018.  He reported that his pain was mostly in his right hip. Examination showed minimal tenderness in the low back and pain with movement of the right hip. He was negative for straight leg raising and did not have any gross motor or sensory deficits.  Dr. Biyani referred Baldwin to Dr. Gupta again for a reevaluation of his hip.  (Tr. 1532).

Dr. Gupta reexamined Baldwin on February 23, 2018.  (Tr. 1531).  Dr. Gupta recommended hip surgery but wanted to do repeat blood sugar tests to make sure that Baldwin's levels were controlled before surgery.  He also ordered an EMG and wanted to review a CT scan of the hip before surgery.  (Tr. 1531).

On June 18, 2018, an MRI of Baldwin's right knee showed a subcutaneous cyst and some degree of fibrosis.  (Tr. 1725-1726).

Baldwin saw Dr. Mark G. Loomis on July 10, 2018 for a neurological consultation. Baldwin reported numbness and tingling in his right hand since his September 2015 accident.  (Tr. 1731).  Examination showed normal gait, motor strength and fine motor movements.  Baldwin did have decreased sensation in the right hand and was positive for Tinel's sign in the right wrist.  (Tr. 1733).  Dr. Loomis recommended an EMG of Baldwin's right upper extremity.  (Tr. 1734).  The EMG study was consistent with choric right radiculopathy at C8 and sensory neuropathy, likely from diabetes.  (Tr. 1736).

### B.    Relevant Opinion Evidence

#### 1.    Treating Surgeon – Dr. James Lyons

On November 9, 2016, Baldwin's surgeon, Dr. James Lyons, completed a disability/return to work certificate restricting Baldwin to occasional kneeling and occasional walking up slopes and stairs.  (Tr. 445).  On June 8, 2016, Dr. Lyons, completed a disability/return to work certificate restricting Baldwin to no repetitive overhead work, no repetitive lifting over ten pounds, and no pushing or pulling with his right arm.  (Tr. 444).

#### 2.    Treating Psychologist – Dr. Teresa Kahler

On July 23, 2018, Dr. Teresa Kahler completed a "mental questionnaire."  (Tr. 1691-1695).  She diagnosed major depression and referred back to the findings from her original evaluation, which she had performed on November 14, 2016.  (Tr. 447-450, 1691).  Part of the

questionnaire is missing from the record.  However, Dr. Kahler opined that Baldwin was markedly limited[2] in his ability to understand and remember detailed instructions; his ability to carry out detailed instructions; his ability to maintain attention and concentration for extended periods; his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; and in his ability to complete a normal workday and workweek.  She also opined that Baldwin would be off task and unable to focus 11%-19% of an 8-hour workday.  (Tr. 1695).

### 3.  Examining Consultants

On February 3, 2017, Harold Nims, D.O., examined Baldwin for physical limitations on behalf of the state agency.  (Tr. 529-539).  Baldwin reported that his primary problems were with pain in his back, right hip and right knee.  (Tr. 529).  Physical examination showed some limitation in range of motion of the shoulders, low back and knees.  (Tr. 531-532).  Dr. Nims also noted a great deal of pain and stiffness in Baldwin's shoulders.  (Tr. 533).  However, Baldwin had normal straight leg raising and 5/5 strength throughout with intact sensation.  (Tr. 532, 534).  Dr. Nims opined that Baldwin's ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling, as well as pushing and pulling heavy objects would be, at least, mildly impaired due to Baldwin's decreased range of motion.  (Tr. 533).

---

[2] Baldwin has attached a blank copy of the questionnaire to his brief.  The questionnaire defined "markedly limited" as "noticeably, obviously, in essence, precluded.  Here, the limitation is such that the individual: WOULD BE OFF TASK 20% OR MORE OF THE 8 HOUR WORKDAY WITH REGARD TO THIS MENTAL TASK.  THE EVALUATOR, BASED ON COMBINATION OF THE 20 MENTAL TASKS WILL ALSO ADDRESS AN OVERAL COMBINED 'OFF TASK' PERCENTAGE.  AN INDIVIDUAL WITH MARKED LIMITATIONS HAS SUCH A LEVEL OF SEVERITY THAT IT IS 'PRECLUSIVE' OF THIS INDIVIDUAL'S ABILITY TO ENGAGE IN THE MENTAL TASK INVOLVED TO ANY USABLE DEGREE IN THE WORK SETTING.  Such individuals, for example, may miss over 2 days per month of work/absenteeism due to impairments beyond normal vacation and sick days or have need for an unreasonable number and length of rest periods outside the customary scheduled breaks which then results in the 'off task' percentage 20% or more, and generally."  (Tr. 1693).

On February 7, 2017, Melissa K. Lanza, Ph.D. examined Baldwin for psychological limitations on behalf of the state agency. Baldwin reported that everyone around him thought he was depressed since his work accident. (Tr. 541). He stated that he was waiting for workers' compensation to approve health treatment and was taking Citalopram in the meantime. (Tr. 543). Dr. Lanza observed blunted affect, but no observable depression symptoms. (Tr. 544). She noted that Baldwin was polite and friendly with normal speech, memory, insight and judgment. (Tr. 544-545). Dr. Lanza opined that Baldwin would have no problems with understanding, remembering and carrying out instructions, or dealing with coworkers and supervisors. She opined that he would have some limitations in his ability to maintain attention and concentration, persistence and pace, perform simple and multi-step tasks, and in his ability to effectively cope with stressors. (Tr. 546).

### 4. State Agency Consultants

On February 13, 2017, state agency reviewing consultant, Yeshwanth Bekal, M.D.. reviewed Baldwin's physical health records and opined that he could lift/carry 20 pounds occasionally and ten pounds frequently; could sit, stand/walk for six hours in an eight-hour workday; could never climb ladders, ropes or scaffolds; could only occasionally crawl; could frequently kneel and crouch; and could only occasionally reach overhead with the right arm. (Tr. 93-95). On June 13, 2017, Stephen Sutherland, M.D., reviewed Baldwin's records and affirmed the opinions of Dr. Bekal. (Tr. 113-115).

On February 13, 2017, state agency reviewing consultant, Leslie Rudy, Ph.D., reviewed Baldwin's mental health records and opined that he had moderate limitations in concentration, persistence, pace, and ability to adapt or manage himself; no limitations in his ability to interact appropriately with others or understand, remember, or apply information; moderate limitations in his ability to carry out detailed instructions and in maintaining attention and concentration for

extended periods; moderate limitations in his ability to complete a normal workday free from psychologically based symptoms, but would be able to carry out 1-4 step tasks in a setting without demands for fast pace or high production; and would have moderate limitations in his ability to respond appropriately to work place changes, but would be able to adapt to occasional changes in a relatively static work setting.  (Tr. 93-96).

On June 9, 2017, Katherine Fernandez, Psy.D., reviewed Baldwin's mental health records and affirmed many of the opinions of Dr. Rudy.  (Tr. 115-117).  Dr. Fernandez found that Baldwin was markedly (rather than moderately) limited in his ability to carry out detailed instructions.  (Tr. 115).

### C.   Relevant Testimonial Evidence

Baldwin testified at the ALJ hearing.  (Tr. 45-69).  He was 50 years old at the time of the hearing.  He was 5'9" and weighed 160 pounds.  (Tr. 46).  He lived with his seventeen-year-old daughter.  (Tr. 56).  Baldwin had a driver's license and was able to drive.  (Tr. 47).  He had completed high school and had obtained a commercial driver's license, which was about to expire. (Tr. 48-49).

Baldwin had last worked on October 28, 2016 as a cement mason, and all of his relevant work history was as a cement mason.  (Tr. 49-51).  That job had required standing all day and lifting very heavy weights.  (Tr. 50).

Baldwin fell off a ladder while working in 2015.  (Tr. 52).  Since then, he had been experiencing right shoulder pain and numbness in his fingers.  (Tr. 53-54).  He was not able to lift his right arm above his shoulder.  (Tr. 54).  He had knee pain and right hip pain.  (Tr. 55).  His knee pain radiated to his lower back and leg.  (Tr. 56).  Baldwin's physicians were planning to perform surgery on his hip and then, possibly, his knee and back.  (Tr. 59, 61).

Baldwin had diabetes and was dependent on insulin.  (Tr. 56).  He had tingling in his feet and his right hand.  (Tr. 57-58).  Baldwin slept poorly and was taking medication.  (Tr. 62).  He got about four hours of sleep per night.  (Tr. 63).  Baldwin was being treated for severe depression.  He went to counseling and took medication.  (Tr. 64).

Baldwin was able to go grocery shopping.  He could lift objects off of shelves with his left hand.  (Tr. 62-63).  His daughter did most of the cooking, but he was able to prepare simple meals.  (Tr. 68-69).  He was also able to shower and change his clothes, clean up after himself and do laundry.  (Tr. 65, 69).  But, he was not able to concentrate very well.  (Tr. 65).  Baldwin testified that he could sit for about 45 minutes at a time.  (Tr. 66).  He estimated that he could lift 40 or 50 pounds with his left hand.  (Tr. 68).

Vocational Expert ("VE") Charles McBee also testified at the hearing.  (Tr. 69-80).  The VE testified that an individual of Baldwin's age, education and work experience, who could perform work at the light exertional level, but could never climb ladders, ropes or scaffolds; could occasionally kneel, crouch or crawl; could occasionally reach overhead with the right upper extremity; could occasionally exercise foot controls with the right lower extremity; could not work around hazards such as moving machinery and unprotected heights; was limited to performing simple, routine and repetitive tasks, but not at a production rate pace; could respond appropriately to occasional interaction with supervisors, co-workers and the general public; could tolerate few changes in the work setting defined as routine job duties that remained static and were performed in a stable, predictable work setting; and any necessary changes would need to occur infrequently and be adequately and easily explained, would not be able to perform Baldwin's past work.  (Tr. 70-71).  However, he would be able to work as a merchandise marker, routing clerk, and cleaner. There were significant numbers of these jobs in the national economy.  (Tr. 72).

10

If the individual was required to shift between sitting and standing every 45 minutes for one or two minutes, he would not be able to perform the housekeeping cleaner job or the routing clerk job. He could perform the merchandise marker job, but the number of jobs would be reduced in the national economy. (Tr. 72-73). This individual could also perform the jobs of office helper and photocopy machine operator. (Tr. 73).

If the first hypothetical individual was limited to sedentary work but did not require the sit/stand option, he would be able to perform the jobs of document preparer, and a reduced number of table work inspectors and address clerks. There were significant numbers of these jobs in the national economy. (Tr. 73-74). The sit/stand option would not have any impact on these jobs. (Tr. 74).

The VE opined that, if the individual were consistently off task 10% of the workday, he would be subject to discipline and dismissal. (Tr. 74). Finally, if the individual missed one or more days of work per month, he would also be subject to dismissal. (Tr. 74-75).

## IV.    The ALJ Decision

The ALJ made the following paraphrased findings relevant to this appeal:

5. Baldwin had the residual functional capacity to perform light work, except he could never climb ladders, ropes, or scaffolds; could occasionally kneel crouch, and crawl; could occasionally reach overhead with the right upper extremity; and could occasionally exercise foot controls with the right lower extremity. He required the ability to shift from a sitting to a standing position every 45 minutes for one to two minutes in the immediate vicinity of the workstation. He could never be exposed to hazards such as moving machinery and unprotected heights. He was further limited to performing simple, routine and repetitive tasks, but not at a production rate pace so, for example, no assembly line work. He could respond appropriately to occasional interaction with supervisors, coworkers, and the general public and could tolerate few changes in the work setting, defined as routine job duties that remained static and were performed in a stable, predictable work setting. Any necessary changes needed to occur infrequently and be adequately and easily explained. (Tr. 21).

9. Considering his age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Baldwin could perform. (Tr. 31).

Based on all of her findings, the ALJ determined that Baldwin had not been under a disability from October 28, 2016, the alleged onset date, through the date of her decision.  (Tr. 32).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . .

will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient

evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a),
416.912(a).

###    B.    Treating Physician Rule[3]

Baldwin argues that, by failing to state good reasons for assigning less than controlling

weight, the ALJ failed to properly evaluate the opinions of his treating psychologist, Dr. Kahler,

and his surgeon, Dr. Lyons.  ECF Doc. 13 at 16-22.  At Step Four, the Commissioner must weigh

every medical opinion that the Social Security Administration receives.  20 C.F.R. §§ 404.1527(c).

An ALJ must give a treating physician's opinion controlling weight, unless she articulates good

reasons for discrediting that opinion.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th

Cir. 2013).  Good reasons for giving a treating source's opinion less-than-controlling weight

include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic

techniques; (2) inconsistency with or contradictory findings in the treating source's own records;

and (3) inconsistency with other substantial evidence in the case record.  *See Biestek*, 880 F.3d at

786 ("An ALJ is *required* to give controlling weight to a treating physician's opinion, so long as

that opinion is supported by clinical and laboratory diagnostic evidence [and] not inconsistent with

other substantial evidence in the record." (citing 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Gayheart*, 710

F.3d 365, 376; *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (stating

that good reasons include that: "(1) [the] treating physician's opinion was not bolstered by the

evidence; (2) evidence supported a contrary finding;  (3) [the] treating physician's opinion was

conclusory or inconsistent with the doctor's own medical records.").  But inconsistency with

nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a

treating physician's opinion.  *See Gayheart*, 710 F.3d at 377 (stating that the treating physician

---

[3] 20 C.F.R. §§ 404.1527 applies to Baldwin's claim because it was filed before March 27, 2017.

14

rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must nevertheless weigh the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention.  *See Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)(i)-(ii).  Nothing in the regulations requires the ALJ to explain how she considered each of the factors.  *See* 20 C.F.R. § 404.1527(c); *Biestek,* 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor.").  However, the ALJ must at least provide good reasons for the ultimate weight assigned to the opinion.  *Cole v. Astrue,* 661 F.3d 931, 938 (6th Cir. 2011) (acknowledging that, to safeguard a claimant's procedural rights and permit meaningful review, 20 C.F.R. § 404.1527(c) requires the ALJ to articulate good reasons for the ultimate weight given to a medical opinion).  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for the weight given to a treating physician's opinion, remand is appropriate.  *Cole,* 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'"  (citing *Rogers,* 486 F.3d at 243)).

### 1.    Dr. Teresa Kahler

There are two opinions from Dr. Kahler in the record.  Her first opinion was rendered after she evaluated Baldwin for any psychological condition as part of his workers' compensation

claim.  (Tr. 447-450).  At the time, Baldwin denied any psychological disorder and was not

participating in any counseling.  (Tr. 449).  After this initial evaluation, Dr. Kahler opined that

Baldwin was experiencing a major depressive disorder as a direct and proximate result of his

September 21, 2015 work injury.  (Tr. 450).  The ALJ evaluated this first opinion from Dr. Kahler

as follows:

> With respect to the claimant's mental impairments, the undersigned notes that the
> claimant was referred for a comprehensive psychological assessment in
> November 2016, due to complaints of depression, difficulties focusing, and
> disturbances in his sleep.  (Ex. 11F, p. 2).  During the subsequent clinical
> interview and mental status examination, he endorsed symptoms of sleeplessness,
> crying spells, symptoms of anhedonia, and reported that he felt "numb inside"
> secondary to the loss of his physical abilities.  (*Id.*, p. 4).  Furthermore, the
> treatment notes show that he had passive thoughts of suicide: however, he was
> able to endorse a safety plan.  Following the evaluation, the attending
> psychologist, Teresa Kahler, Ph.D., diagnosed the claimant with a major
> depressive disorder and then referred him to outpatient counseling.  (*Id.*, p. 5).  At
> the time of the assessment, Dr. Kahler also opined that the claimant was
> "temporarily and totally disabled to return to his former avenue of employment,
> nor is he capable of working in any other capacity."  (*Id.*, p. 5).  However, this
> opinion appears to have been offered to ensure that the claimant's claim was
> approved for Workers' Compensation coverage, as opposed to represent
> limitations in his residual functional capacity.  As such, this opinion is given little
> weight in the present decision.  (Tr. 25).

The ALJ assigned little weight to Dr. Kahler's first opinion because she found that it was

offered as part of a Workers' Compensation evaluation.  Because Dr. Kahler was not Baldwin's

treating physician when she offered this opinion, the ALJ was not required to assign controlling

weight to it.  Moreover, she was not required to accept Dr. Kahler's opinion on the ultimate issue

of Baldwin's inability to work.  In the Social Security context, that decision is reserved for the

Commissioner.  *See Sims v. Comm'r of Soc. Sec.,* 406 F. App'x 977, 980 n.1 (6th Cir. 2011).  The

ALJ generally may give little deference to such opinions because they are reserved for the

Commissioner.  *See Quisenberry v. Comm'r of Soc. Sec.,* 757 F. App'x 422, 431 (6th Cir. 2018).

Baldwin has not identified any error in the ALJ's evaluation of Dr. Kahler's first opinion, rendered

before she became his treating psychologist.

16

Dr. Kahler's second opinion must be evaluated differently.  The ALJ recognized that Dr. Kahler later became Baldwin's treating psychologist: "Following the initial evaluation by Dr. Kahler, the record reflects that the claimant was enrolled in biweekly supportive therapy services on an outpatient basis."  (Tr. 26).  Then, after summarizing Dr. Kahler's July 2018 opinion, the ALJ stated:

> With respect for the opinion offered by Dr. Kohler [*sic*] that the claimant has mild to moderate limitations in functioning, the undersigned notes that her opinion is not a residual functional capacity assessment detailing what the claimant can and cannot do despite his limitations, but rather appears to merely identify areas of strengths and weaknesses without qualifying the context in specific vocational terms.  Moreover, the undersigned notes that her opinion is not entirely consistent with the treatment notes as a whole, which indicate that the claimant received only limited mental health treatment on an outpatient basis.  Therefore, based upon the foregoing, the undersigned gives only some weight to Dr. Kohler's [*sic*] opinion.

(Tr. 26).

Because Dr. Kahler was Baldwin's treating psychologist when she issued this July 2018 opinion, the ALJ was required to explain the weight she assigned to this opinion and to provide good reasons for that weight if less than controlling weight was assigned.  20 C.F.R. § 404.1527(c).  And she did.  The ALJ stated that Dr. Kahler's opinions were not entirely consistent with the treatment notes.  The ALJ found that Dr. Kahler's treatment notes showed that Baldwin had complained of fatigue, depressed mood and low energy levels.  (Ex. 33F, Tr. 1697-1698).  This is a fair description of Dr. Kahler's treatment notes, which cover a six-month period and are only two pages long.  Most of her notes are dedicated to documenting Baldwin's problems with sleep and fatigue.  Some of the entries document the fact that Baldwin had experienced greater sadness due to the death of his infant grandson, but Baldwin's primary complaint was related to poor sleep.  (Tr. 1697-1698).

The ALJ also compared Dr. Kahler's opinion with other record evidence; she cited the psychiatric evaluation performed by Dr. Sherman and the GAF score of 60 assigned by Dr.

17

Sherman, suggesting only moderate symptoms.  (Tr. 26, 1543-1554).  These were appropriate facts for the ALJ to consider in her assessment of the weight to be assigned to Dr. Kahler's 2018 opinion[4].

The ALJ also noted that Dr. Kahler's finding that Baldwin had mild to moderate mental limitations did not directly translate into *functional* limitations from which Baldwin may have suffered.  The ALJ actually included many limitations in the RFC based on Baldwin's mental impairments.  She limited Baldwin's functional abilities to "performing simple, routine and repetitive tasks, but not at a production rate pace so, for example, no assembly line work.  He could respond appropriately to occasional interaction with supervisors, coworkers, and the general public and could tolerate few changes in the work setting, defined as routine job duties that remained static and were performed in a stable, predictable work setting.  Any necessary changes needed to occur infrequently and be adequately and easily explained."  (Tr. 21).  When comparing these limitations to the opinion expressed by Dr. Kahler in July 2018, it is unclear how the RFC determination would have differed if the ALJ had assigned more weight to it.  The ALJ was not required to assign controlling weight to Dr. Kahler's opinion regarding total disability, and the ALJ did not necessarily reject Dr. Kahler's other opinions. In fact, it appears that the ALJ incorporated these opined limitations into Baldwin's RFC.

Baldwin has complained that the ALJ did not provide good reasons for failing to assign controlling weight to Dr. Kahler's opinions.  As explained above, I disagree.  The ALJ explained that Dr. Kahler's opinions did not translate into specific functional limitations that could be

---

[4] Under the agency's regulations, good reasons could include factors such as the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6).

incorporated into Baldwin's RFC.  And the ALJ compared Dr. Kahler's opinion both to her own treatment notes and to the evaluation performed by Dr. Sherman, which showed only moderate limitations caused by Baldwin's psychological condition.  These records did not support the inclusion of more restrictive limitations in Baldwin's RFC.

Furthermore, even if Baldwin *had* shown that the ALJ failed to provide good reasons for the weight assigned to Dr. Kahler's opinion, he has not explained how this would have had any impact on the RFC determination.  The one exception may possibly relate to Dr. Kahler's opinion that Baldwin would be off task 11-19% of the time.  (Tr. 1695).  Baldwin cites the VE's testimony that missing one day of work per month and/or being off task 10% or more would subject an individual to dismissal.  (Tr. 74-75).  Thus, if this part of Dr. Kahler's opinion had been incorporated into Baldwin's RFC, all work would have been precluded.  But Dr. Kahler's absenteeism and off-task opinion was only a circled response on a multiple-choice questionnaire.  And, more importantly, it was not supported by the record.  Baldwin was not working when he treated with Dr. Kahler.  Thus, she could not have based her opinion on his actual ability to sustain work.  Nor does the record show that Baldwin had missed appointments or had been unable to participate in his appointments with Dr. Kahler.  Accordingly, it appears that Dr. Kahler's circled estimation of Baldwin's inability to sustain work lacked actual support from Baldwin's record.  And, because this part of Dr. Kahler's opinion did not find support in the record, the ALJ's decision to exclude the limitation in Baldwin's RFC was justified.  At worst, the ALJ's failure to adopt it or provide good reasons for its rejection was harmless error.  *See Pellegrino v. Comm'r of Soc. Sec.,* 2020 U.S. Dist. LEXIS 50395, *13-14 (N.D. Ohio, March 24, 2020), citing *Hernandez v. Comm'r of Soc. Sec.,* 644 F. App'x 468, 474 (6th Cir. 2016) (citations omitted)("The ALJ's failure to consider [the treating physician's] opinions constitutes harmless error because [the treating physician's] check-box opinions pertaining to the effect [claimant's] pain had on her

absenteeism along with her need to engage in off-task behavior and breaks "[are] 'weak evidence at best' and meet[] our patently deficient standard."); *see also Keeton v. Comm'r of Soc. Sec.,* 583 F. App'x 515, 525 (6th Cir. 2014).

I find that the ALJ properly summarized the record evidence and adequately cited support for the weight assigned to Dr. Kahler's opinions.  Baldwin has not identified any error in the ALJ's evaluation of these opinions.  And, even if the Court were to find that the ALJ had erred by failing to state good reasons for the weight assigned to Dr. Kahler's absenteeism opinion, that error would have been harmless.

### 2.    Dr. Lyons

Baldwin also briefly argues that the ALJ failed to state good reasons for rejecting the opined permanent restrictions of his treating orthopedic specialist, Dr. James Lyons.  ECF Doc. 13 at 22.  Dr. Lyons' opinions were "return to work" opinions prepared for Baldwin's workers' compensation claim.  After summarizing Dr. Lyons's opinions and pointing out that such opinions were of limited value in determining whether an individual is disabled, the ALJ stated:

> The undersigned gives only some weight to the opinion of Dr. Lyons.  In making this finding, the undersigned notes that Dr. Lyons' opinion is not entirely consistent with the medical evidence of record.  Specifically, the undersigned notes that his opinion is inconsistent with treatment notes from Toledo Orthopedics and from West Side Orthopedics, which indicate that the claimant has maintained a normal gait despite limitations associated with chronic knee and hip pains.  However, the undersigned notes that the opinion of Dr. Lyons is consistent with the MRI scans of the claimant's knee from June 2018, which show a Bakers cyst in the right knee.  (Ex. 35F).  Therefore, based upon the foregoing, the undersigned gives some weight to the opinion of Dr. Lyons.  (Tr. 28).

The ALJ found that Dr. Lyons's opinions were supported by objective evidence, such as an MRI, but they were not indicative of Baldwin's actual functional abilities.  In support, the ALJ cited records showing that Baldwin maintained a normal gait, despite the serious injuries sustained from his workplace accident.

And Baldwin's argument related to Dr. Lyon's opinions suffers from the same inadequacy as his argument concerning Dr. Kahler.  Baldwin has not explained how the ALJ's alleged failure to state good reasons for the weight assigned to Dr. Lyons's opinions had any impact on the ALJ's RFC determination.  Dr. Lyons limited Baldwin to occasional kneeling with the right knee and occasional walking up slopes and stairs.  (Tr. 445).  The ALJ's RFC determination expressly limited Baldwin to occasional kneeling and provided that he could never climb ladders, ropes or scaffolds.  Similarly, Dr. Lyons opined that Baldwin could not repetitively lift overhead with his right arm and could not lift over 10 pounds with his right arm.  (Tr. 444).  The ALJ's RFC limited Baldwin to light exertional work, meaning lifting no more than 20 pounds with both arms and only 10 pounds on a frequent basis.  20 C.F.R. § 404.1567(b).  These limitations were not necessarily inconsistent with Dr. Lyons's opinions.  Thus, it is unclear how assigning more weight to those opinions would have had any impact on the ALJ's RFC determination.  Baldwin has not fully developed this argument.

Because the ALJ's decision was supported by substantial evidence and Baldwin has not identified any harmful error in the ALJ's evaluation of the treating source opinions, I recommend that the court affirm the ALJ's decision.

### C.    Hypothetical Questions to the VE

Baldwin also argues that the ALJ's hypothetical questions to the VE were not supported by substantial evidence because they did not incorporate all of the limitations from Dr. Kahler's and Dr. Lyons's opinions.  ECF Doc. 13 at 22-23.  As already explained, Baldwin has not identified any harmful error related to the ALJ's evaluation of the treating physicians' opinions.  And, Baldwin has not explained how the ALJ's hypothetical questions were otherwise inaccurate or incomplete.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v).  An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics.  *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a VE in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations she finds credible."  *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

Here, Baldwin argues that the hypothetical questions to the VE were incomplete because they tracked the ALJ's RFC findings, and Baldwin argues that those findings were inadequate. Baldwin cites objective medical evidence, such as a right hip MRI showing a labral tear and early degenerative changes that support his complaints of pain and limitation.  ECF Doc. 13 at 23-24. But he has not cited evidence showing more functional limitations than those incorporated into the ALJ's RFC.  For example, Baldwin argues that he had "right shoulder impingement and subacromial decompression and debridement"; "he had right upper extremity numbness"; and

elevating his right arm was painful.  ECF Doc. 13 at 24.  But, he has not cited any evidence showing that he was more limited in his ability to lift than determined by the ALJ's RFC determination which limited him to light work.  In fact, Baldwin testified at the hearing that he was able to lift 40 pounds with his left hand alone.  (Tr. 68).

The RFC is a determination for the ALJ, but it must be based on all the relevant evidence.  20 C.F.R. §§ 416.920(e); *Rudd v. Comm'r of Soc. Sec.,* 531 F. App'x 719, 728 (6th Cir. 2013).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

Here, the ALJ properly considered all of the evidence, including the objective medical evidence, the physicians' opinions, and Baldwin's testimony regarding his functional abilities.  The ALJ's RFC determination was supported by substantial evidence from the record.  Baldwin has not demonstrated otherwise.  Because the ALJ's RFC and correlating hypothetical question to the VE were supported by substantial evidence, the ALJ properly relied upon the VE's responses to the hypothetical questions.  *Howard*, 276 F.3d at 238.  Because the ALJ's decision was supported by substantial evidence and Baldwin has not identified any harmful error in final step of the sequential analysis, I recommend that the court affirm the ALJ's decision.

## VI.     Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Court affirm the Commissioner's final decision denying Baldwin's application for DIB.

Dated: December 10, 2020

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).